## DeVaughn vs. Howell.

1. At the time land is rented, the landlord has the right to reserve in the rent contract the title to the crops to be grown until his rent and advances are to be paid. The general rule that things not *in esse* cannot be sold, does not apply to a case of this character.

2. Such a contract being made in 1884, and it being agreed therein that the tenant was also to have the land and certain mules for the years 1885 and 1886 at the same terms, provided he paid the landlord for rent and all advances for each year, and it being a fair presumption that the rent was paid for 1884 and 1885, and the tenant remained on the farm until June, 1886, when he died, and recognized the contract as binding on him for 1886, it was binding as to such reservation of title as fully for the year 1886 as for 1884.

3. When the landlord is fully paid for the rent and advances, and for his necessary expenses in cultivating and gathering the growing crop of 1886, if there is a balance left, the widow of the tenant, to whom the crop has been set apart as a year's support, will be entitled to it.

March 18, 1889.

Landlord and tenant. Title. Contracts. Sales. Rent. Year's support. Before Judge Fort. Macon superior court. November term, 1887.

On April 11, 1887, Mrs. Frances J. Howell sued J. E. DeVaughn in trover for a horse, 105 bushels of corn, five bales of cotton, six gallons of syrup, 262 pounds of fodder and ten bushels of potatoes, and also for the hire and use of the horse and articles mentioned. The defendant pleaded the general issue. Also that J. J.

Howell, plaintiff's husband, who was his tenant, died June 12th, 1886, and left the crops then growing on defendant's land in an unfinished and unmatured condition, needing cultivation and labor; that plaintiff was unable to supply the means and labor to cultivate and gather the crop, and defendant, being landlord and owner of the land, in order to protect his interest and secure his rents and advances, on the sixth of July, took charge of the crops and furnished the means and labor to cultivate and gather them, and but for this they would have been entirely lost; and that to this end he expended $325.00 after the death of said J. J. Howell, and is entitled to retain the crops or proceeds thereof until he has been fully reimbursed said sum.

Upon the trial, the evidence for the plaintiff tended to show that she was the widow of J. J. Howell, who died June 12th, 1886, in possession of the horse sued for and growing crops rented by him from defendant. The horse was worth $50.00, and was worth $20.00 a year for hire. After her husband's death, defendant took possession of the place and the crops and horse, not with her consent. The horse belonged to her husband and not to his brother, and her husband left about $10.00 in money. Defendant took possession of the crops early in July following her husband's death. The corn crop at that time was just plowed, and ought to have made 150 bushels. The cotton crop was in pretty good condition, except a few acres which were grassy, and this could have been cleaned out and put in good order for about $10.00. There were some cane and potatoes on the place, but how much plaintiff's evidence does not show. One Penny worked on part of the land rented by plaintiff's husband, and owned half of the crop made on the portion worked by him. There were twelve bales made on the entire place. The exact num-

ber of acres worked by Penny, and the amount of cotton, etc. made thereon, do not appear from plaintiff's testimony; $3.00 of the money left by plaintiff's husband, and $1.50 of plaintiff's money, were used on the crop. J. J. Howell's sister furnished him with the money to run the crop, and defendant furnished nothing to make the crop except two hoes. Plaintiff left the place soon after her husband's death. She did not tell defendant that she knew, under the contract between him and her husband, that the entire crop belonged to defendant until the rent and advances were paid, nor that she was unable to do anything and that he could take the crops and do the best he could with them, and pay himself what he could out of them, nor that the horse was the property of her husband's brother; nor did she turn the horse and crops over to him. The son-in-law of plaintiff, who was the only witness in her behalf except herself, testified that the horse was J. J. Howell's, and that he never knew or heard of any one else claiming him except J. J. On cross-examination, this witness testified that, after said J. J.'s death, he went with P. C. Howell to defendant's store, and P. C. Howell made a demand for the horse and claimed that it was his, then and there making an affidavit to that effect. This witness testified that he had seen some sort of writing from P. C. Howell to plaintiff concerning the horse, but thought it was to release the horse from an execution against J. J. which P. C. had taken up. He went with plaintiff to see defendant after her husband's death, and told defendant that if he would pay the mortgage plaintiff's sister had for money furnished to run the crop, defendant could take the crop. Defendant refused to do this, said he must be paid his rent and advances first, and hoped there would be a nice little slice left for plaintiff. This witness also testified that

he heard James Penny say that if plaintiff, in a certain conversation testified about by James Penny, had turned over the horse or crop to defendant, he did not know it. As to these latter particulars, this witness was corroborated by the plaintiff.

It was also shown for plaintiff that she made application for year's support, and there was introduced in her behalf a petition to the ordinary therefor, the appointment of appraisers, the return of the appraisers, the approval of that return by the ordinary, and its admission to record. Among other things set apart were the horse, 115 bushels of corn in the field, 5 bales of cotton " exclusive of rent," 60 gallons of syrup, 262 pounds of fodder and 10 bushels of potatoes, which it appears were the horse and crop sued for, and which were estimated by the appraisers as of the value of $300. It appears that DeVaughn caveated the return of the appraisers on the ground that the title to the articles enumerated above was in him ; that the ordinary refused to entertain this caveat on the ground that he had no jurisdiction of the question of title ; and that DeVaughn took the matter by appeal to the superior court, and his appeal was there dismissed on the same ground.

The testimony for the defendant tended to show that when J. J. Howell died, the cotton crop was in such condition, except that portion cultivated by Penny, that it was practically worthless ; that plaintiff and her son-in-law promised to look after the crop but failed to do so ; that plaintiff then told him she could not do anything with the crop, neither could her son-in-law; that she knew that, under the contract between her husband and defendant, the entire crops were to be defendant's until his rent and advances were paid, and for defendant to take the crops and do the best he could, and pay himself what he could get out of them. She

said the horse belonged to P. C. Howell, but for defend-
ant to take him, as she knew he had a claim against
him, and she knew the horse had to be fed, etc.    The de-
fendant then took charge of the place and crops and
furnished in labor, etc. on them about $200; he fur-
nished in Howell's lifetime corn, etc., and paid for the
coffin for Howell and for about $65 worth of guano;
also furnished bagging, ties, etc. for use on the crops,
after Howell's death, $5 or $6.    After the crops were
taken charge of by defendant, on account of the labor
put on them and favorable seasons, they turned out
much better than it seemed that they would at Howell's
death.    There were 12 bales of cotton made on the
whole place, 7 on the Penny crop and 5 on the Howell
crop.    Penny claimed half of his crop and a half-bale
for his wife, which plaintiff admitted Mrs. Penny was
entitled to.    The five bales of the Howell crop were
worth about $200, and the seven bales of the Penny
crop $250.    There were also raised in the crop 72
bushels of corn worth $36, of which Penny claimed 30
bushels, and cotton-seed, cane and fodder worth about
$35.    The horse was worth but very little, not exceed-
ing $30 or $40.    Penny swore for defendant that he
heard the conversation between plaintiff and defendant
in which she turned over horse and crops to him as tes-
tified to by him, etc.    He denied that he made any such
statement as was testified to by Gammon.    There was
also testimony that J. J. Howell had admitted before
his death that the crops raised on the entire place be-
longed to DeVaughn until he was paid his rent and ad-
vances; and other testimony not material.

There was put in evidence for defendant a contract
made June 7th, 1884, for the year 1884, by plaintiff's
husband, for the rent of the land in question, by which,
in consideration of DeVaughn's furnishing the land,

two mules and wagon, utensils, cotton-seed, etc., the said J. J. Howell agreed to do certain fencing, take care of the stock, work the land in a husbandlike manner, and pay ·DeVaughn 2,600 pounds of cotton rent, by February 1st, 1884; and in consideration of DeVaughn's furnishing supplies, etc., he sold and conveyed to DeVaughn his entire crop made for 1884, until DeVaughn should be fully paid. As an additional clause to this instrument, it is agreed by Howell (among other things) that he is to have the lands, mules and utensils for 1885 and 1886 at the same terms, provided he succeeds in paying DeVaughn for rent and all advances for each year; otherwise he agrees to surrender the place to DeVaughn when called on to do so. There was also introduced for defendant two letters of J. J. Howell to said defendant, one dated February 2d, the other February 19th, 1886, requesting that DeVaughn send him some guano, oats, flour and coffee, stating that he would settle for them soon, or when he came up.

The jury found for plaintiff $300. The defendant moved for new trial on the grounds that the verdict was contrary to law and evidence, and of error in the charge of the court, as set out in the decision. The court passed an order granting a new trial unless plaintiff would write off $50.00 from the verdict. This she did, and defendant excepted to the refusal to grant a new trial unconditionally.

R. F. LYON, J. B. HOLMES and J. M. DuPREE, for plaintiff in error.

E. A. HAWKINS and J. W. HAYGOOD, *contra.*

SIMMONS, Justice.

J. J. Howell, in the year 1884, entered into a written

contract with DeVaughn for the rent of a certain plantation and mules for that year, whereby he agreed to pay said DeVaughn 2,600 pounds of lint-cotton. He made other agreements in said contract, as to repairing fences and attending to stock, which need not be mentioned here. DeVaughn agreed to furnish a certain amount of supplies. It was also further agreed that Howell was to have said land and mules for the years 1885 and 1886, at the same terms, "provided Howell paid said DeVaughn for rent and all advances for each year." In order to secure DeVaughn in the payment of the rent and advances, the contract says, "I hereby sell, assign and convey unto said DeVaughn all my interest in and to said crop of all sorts made by me and my tenants, and consent that the title of the same shall vest and remain in said DeVaughn or assigns until he shall have been fully paid for all articles I may be due him for." Howell occupied the farm for the years 1884 and 1885, and up to June, 1886, when he died before the crop had matured. He left his widow upon the farm, who undertook to carry it on but failed; whereupon DeVaughn took possession and cultivated and gathered the crop. The widow applied for a year's support, and the crop was set aside to her by the ordinary. She brought trover against DeVaughn to recover possession of the crop. Upon the trial of the case, under the charge of the court, the jury returned a verdict in her favor. DeVaughn moved for a new trial, upon the several grounds stated therein, which was overruled by the court, and he excepted.

The ground relied upon here by counsel for the plaintiff in error for a reversal of the judgment of the court below is as follows : The court erred in charging the jury that it was his duty to construe the contract mentioned above under which DeVaughn claimed title to

the crops in dispute, and in so far as this contract, made in 1884, undertook to pass title to DeVaughn to the crops of 1886, it was void and of no effect; that it was contrary to law to permit a title to be maintained to the crop made in 1886 by such contract made in 1884, and that DeVaughn could not maintain title to the crops under such contract.

We think the exception to this charge is well-founded. While it is true, as a general rule, that things not *in esse* cannot be sold, we do not think that that rule applies to a case of this character. Here was a landlord who made a rent contract with his tenant, and the tenant not only agreed to sell the crop, but went further and agreed that the title to all the crops made on the farm should remain in the landlord until the landlord was fully paid for his rent and all advances. We see no reason why a landlord, when he rents his farm, cannot reserve in the rent contract the title to the crops grown thereon until his rent and advances are paid. It is simply a reservation of the fruits of his own land. It is not like an owner of land selling his crop before it is planted, or a tenant mortgaging his crop before it is planted. This direct question has never been before this court before, but it seems to have arisen in other States. In the case of Smith *vs.* Atkins, 18 Vermont, 465, Redfield, J., in discussing this question, says: "It is without doubt true that the sale of a thing not in existence is, upon general principles, inoperative, being merely executory, that is, it confers no title in the thing bargained. But when the thing thereafter to be produced is the produce of land or other thing, the owner of the principal thing may retain the general property of the thing produced, unless there be fraud in the contract, and it be entered into merely to defeat creditors. The leasing of land, or domestic animals, or delivering

to another property to trade with—the lessee having still an interest in the thing, but the general property remaining in the lessor,—is not a sale of things not *in esse*, nor is it so to be esteemed, even where the lessor retains a lien for his rent upon the product of the land, or the animals."

In the case of Bellows *vs.* Wells, 36 Vermont, 601, 602, Poland, C. J., says: "It has been repeatedly decided in this State, that the lessor of land may stipulate in the lease that the crops grown on the premises by the lessee shall remain the property of the lessor until the rent shall be paid, and that such provision is valid, not only between the parties but as to third persons also. . . . The reasoning upon which our decisions go is, that the owner of the land being also the owner of the fruits or products of it, in parting with the use of it to another, may make such conditions and reservations in relation to the land itself or the products grown from it as he chooses, instead of parting with the full right. The principle is the same as that upon which conditional sales of personal property are upheld."

In the case of Andrew *vs.* Newcomb *et al.*, 32 N. Y Rep., Denio, C. J., says: "The owner of land may lawfully contract for its cultivation, and may provide in whom the ownership of the product shall vest." See also Heald *vs.* Builders' Fire Insurance Company, 111 Mass. 38; Butt *vs.* Elliott, 19 Wall. 544; Wentworth and Osborn *vs.* Miller and Lux, 53 Cal. 9; Howell *vs.* Forster, 65 Cal. 169; Lewis *vs.* Lyman, 22 Pick. 437; Ponder *vs.* Rhea, 32 Ark. 435; Am. and Eng. Encycl. L., note on p. 896. These cases, we think, fully sustain our position in this case. We think the principle ruled is sound and fair, both to the landlord and the tenant. It follows, therefore, that the contract made between DeVaughn and Howell was a valid and binding contract,

and that the title to the crop vested and remained in DeVaughn until he was paid his rent and the advances made by him for the year 1886.

2. It may be argued, however, that this principle would have applied to the year 1884, when the contract was made, but could not apply to the crops made in 1886, because the contract was made moɪe than two years before that time. We do not see any difficulty in that suggestion. The contract was absolute for the year 1884, and conditional for the years 1885 and 1886. It was stipulated in the contract that the same terms should apply to these years as to 1884, if the rent was paid. We presume the rent was paid for 1884 and 1885, as the evidence shows that Howell was still on the farm up to June, 1886, when he died. He recognized the contract as binding upon him for that year, as the evidence in the record shows. And in our opinion, if he had paid his rent for the two previous years, it was as binding in the year 1886 as it was in the year 1884. The case of *Almand vs. Scott & Co.*, 80 *Ga.* 95, was different in its facts from this case. In this case, there is a *written* contract between the landlord and tenant in which the crops were sold to the landlord by the tenant, and the title thereto reserved by the landlord. In *Almand's* case the contract was for a part of the crop, and was a *verbal* one between him and his tenant, and not in writing as required by the code, §2289. That section is as follows: "When the rent agreed to be paid is a part of the crop, such portion shall not be liable to be levied on by any process for debt against the tenant; provided, the contract is in writing and the rent does not exceed one-half of the crop." This section should have been cited in *Almand's* case.

3. When DeVaughn is fully paid for his rent and advances, and for the necessary expenses in cultivating

and gathering the growing crop of that year, if there is a balance left, we think that Mrs. Howell would be entitled to it. It will be for the jury to say on the next trial what were the necessary expenses incurred by DeVaughn in the cultivation and gathering of that crop. She would also be entitled, under the evidence in this record, to recover the horse and its reasonable hire.

Judgment reversed.